United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NORTHERN CALIFORNIA MINIMALLY
INVASIVE CARDIOVASCULAR
SURGERY, INC.; RAMZI DEEIK, M.D.,

      Plaintiffs,

   v.

NORTHBAY HEALTHCARE
CORPORATION; NORTHBAY
HEALTHCARE GROUP, INC.;
NORTHBAY HEALTHCARE MEDICAL
GROUP, INC.,

      Defendants.

No. C 15-06283 WHA

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO
DISMISS; VACATING MOTION
HEARING AND MOVING CASE
MANAGEMENT CONFERENCE
TO ELEVEN A.M.**

**INTRODUCTION**

In this antitrust action, defendants move to dismiss under Rule 12. To the extent stated herein, defendants' motion is **GRANTED IN PART AND DENIED IN PART**. The motion hearing set for April 21 is **VACATED**. The initial case management conference, originally set for April 21 at Eight A.M., is moved to **APRIL 21 AT ELEVEN A.M.**

**STATEMENT**

The following well-pled facts are assumed to be true for the purposes of the present motion. Beginning in 2007, plaintiff, Dr. Ramzi Deeik, and alleged conspirator Dr. Robert Klingman (not a party herein), operated a surgery practice called Napa Valley Cardiac & Thoracic Surgery, Inc. (NVCTS), which serviced defendant NorthBay Medical Center's cardiac, thoracic, and vascular surgery programs. NVCTS had a contract with NorthBay to conduct

surgeries on the medical center's monthly call schedule.  During this time, Dr. Deeik also had

full surgical privileges at two other hospitals, Queen of the Valley Medical Center and Santa

Rosa Memorial Hospital (Compl. at ¶¶10, 35, 46).

After developing a successful cardiac surgery program (with NVCTS), NorthBay's next

goal was to develop a successful vascular surgery program.  To that end, it recruited Dr.

Sepehre Naficy, a newly minted vascular surgeon, to help build up this new specialty with Dr.

Deeik and Dr. Klingman.  Dr. Deeik supervised Dr. Naficy, but began expressing concerns

about his problematic vascular surgical outcomes.  In response, NorthBay essentially swept Dr.

Deeik's concerns about Dr. Naficy under the rug, and ceased its peer review program, allegedly

because NorthBay did not want to endanger its new vascular surgery practice, which was still in

its infancy.  Furthermore, at the time Dr. Deeik expressed his concerns, NorthBay "planned a

major bond deal that depended, in part, on the success of the full range of its surgical specialty-

related service lines" (Compl. at ¶¶23, 36–40).

At this point, while Dr. Deeik had been questioning NorthBay's vascular surgery

program, Dr. Deeik and Dr. Klingman's relationship began to sour.  Thus, to eliminate Dr.

Deeik, "NorthBay administrators, Dr. Klingman, and Dr. Naficy, and other possible unknown

parties (the 'conspirators') commenced a series of clandestine discussions evincing a new

relationship to replace NVCTS upon expiration of its contract with NorthBay in 2012" (Compl.

at ¶ 41).  Specifically, the complaint names the following NorthBay administrators as players in

the scheme who conspired with Dr. Klingman:  Deborah Sugiyama (President); Kathy

Richerson (Chief Nursing Officer); Dr. Mitish Patel (Chief Medical Officer); and Dr. Thomas

Erskine (Chief of Medical Staff).  According to the complaint, this scheme had many prongs,

with the ultimate goal of squeezing Dr. Deeik out of NorthBay while also destroying his

reputation at other hospitals to reduce and eventually eliminate him as a competitive threat

(Compl. at ¶¶ 22, 53).

*First*, administrators at NorthBay and Dr. Klingman agreed to change several call

coverage policies and agreed to selectively enforce them only against Dr. Deeik.  Specifically,

NorthBay enhanced the requirements regarding backup surgeons, requiring Dr. Deeik to have a

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   qualified backup surgeon available for all surgeries.  Thereafter, Dr. Klingman and Dr. Naficy

2   refused to serve as Dr. Deeik's backup.  When Dr. Deeik obtained another area surgeon, Dr.

3   Samer Kanaan, to serve as a backup for him, administrators at NorthBay contacted Dr. Kanaan,

4   pressured and threatened him, disparaged Dr. Deeik, which led Dr. Kanaan to withdraw his

5   agreement to serve as Dr. Deeik's backup.

6          Before contacting Dr. Kanaan, NorthBay administrators Sugiyama, Richerson, and Dr.

7   Patel sent several emails to each other discussing their plan to keep Dr. Kanaan from serving as

8   Dr. Deeik's backup, with Sugiyama stating "[w]ell must admit I didn't see this one coming!

9   Guess we will have to see what or if [Dr. Klingman] has thoughts about this" and Richerson

10  stating "[p]robably need a conversation with [Dr. Klingman] on Mon and a call to Dr. Kanaan

11  also.  I will do that first thing on Mon morning" (Compl. at ¶ 57).  After rescinding his

12  agreement to serve as Dr. Deeik's backup, Dr. Kanaan told Dr. Deeik that "he felt beat down,

13  embarrassed, and sorry, but that he could not back up [Dr. Deeik] at NorthBay after all"

14  (Compl. at ¶ 58).  Sugiyama later admitted that NorthBay chose only to enforce the backup

15  requirement against Dr. Deeik.  A similar pattern occurred when Dr. Deeik found another

16  surgeon to back him up, Dr. Sarah Minasyan (Compl. at ¶ 60).

17         *Second*, while selectively enforcing new requirements against Dr. Deeik to force him out

18  of NorthBay, the administrators and Dr. Klingman engaged in a smear campaign in order to

19  convince other hospitals in the market to also squeeze Dr. Deeik out.  According to the

20  complaint, this smear campaign was necessary to prevent Dr. Deeik from taking his patients

21  away from NorthBay to other competing hospitals.  Moreover, it caused competitive harm by

22  eliminating an allegedly superior surgeon from the market who had the ability to conduct

23  minimally invasive surgeries for patients in the area.

24         Initially, Dr. Klingman falsely told many doctors and staff at other hospitals that Dr.

25  Deeik had embezzled money from their joint venture.  As will be discussed further below, Dr.

26  Deeik initiated an arbitration against Dr. Klingman alleging defamation, among other claims,

27  relating to these false allegations.  The arbitrator found for Dr. Deeik on the defamation claim,

28  finding that Dr. Klingman had knowingly spread false allegations against Dr. Deeik, and

3

United States District Court

For the Northern District of California

1   awarded Dr. Deeik over $600,000 in damages based on harm to his professional reputation

2   (Compl. at ¶ 43).

3          Moreover, NorthBay administrators, in agreement with Dr. Klingman, also participated

4   in the smear campaign.  Several administrators falsely spread word that Dr. Deeik had moved to

5   Santa Rosa and was no longer conducting surgeries in the area, the purpose of which was to

6   dilute future referrals to Dr. Deeik.  As an additional aspect of the scheme, NorthBay

7   administrators "instructed the head of NorthBay's hospital security to conduct a clandestine

8   investigation into [Dr. Deeik] for any useful information that could be used against him"

9   (Compl. at ¶ 54).  This included contacting law enforcement agencies.

10         *Third*, NorthBay administrators and Dr. Klingman expanded the conspiracy to include

11  St. Helena Hospital, a local competitor to NorthBay.  St. Helena agreed to allow Dr. Gansevoort

12  Dunnington to conduct most of his surgeries at NorthBay, despite the fact that he had been a

13  paid, full-time employee of St. Helena.  This allowed Dr. Dunnington to "not only provide

14  backup coverage for Dr. Klingman and Dr. Naficy, he could take [Dr. Deeik's] share of the call

15  schedule so that if and when [Dr. Deeik] overcame Klingman's call-policy obstacles, there

16  would be even fewer opportunities for him at both NorthBay and the Queen" (Compl. at ¶

17  62(g)).

18         *Fourth,* when NVCTS dissolved, due to infighting between Dr. Deeik and Dr.

19  Klingman, NorthBay renewed its contract only with Dr. Klingman's newly formed practice.  It

20  excluded Dr. Deeik's new entity called Northern California Minimally Invasive Cardiovascular

21  Surgery (the other plaintiff herein).  Once they had effectively squeezed Dr. Deeik out, Dr.

22  Klingman and NorthBay administrators exchanged emails stating the following, showing that

23  they intended to keep Dr. Deeik from practicing at competing hospitals:  "Queen will be ending

24  any contracts with [Dr. Deeik] and only using [Dr. Klingman's] group" and "no one at Queen

25  will be sending business to [Dr. Deeik]" (Compl. at ¶ 62(c)).

26         *Fifth*, NorthBay administrators began tracking referral patterns to determine which

27  cardiologists made the most surgical referrals to Dr. Deeik.  Subsequently, three of Dr. Deeik's

28  top referrers were offered new and lucrative positions at NorthBay and the referrals to Dr.

4

United States District Court

For the Northern District of California

1  Deeik immediately stopped, achieving the goal of freezing Dr. Deeik's supply of patients

2  (Compl. at ¶ 62(d)).

3  Essentially, the complaint alleges that Dr. Klingman and administrators at NorthBay

4  engaged in a scheme to force Dr. Deeik out of NorthBay (to keep him from divulging

5  NorthBay's substandard surgical results and ensure bond financing) and then to disparage his

6  reputation to keep other hospitals from doing business with him.  Dr. Deeik alleges the result of

7  the scheme is that the area's only minimally invasive and robotic cardiac surgeon (himself) and

8  the area's only minimally invasive and robotic thoracic surgeon (Dr. Kanaan) have been forced

9  out of the market.  While Dr. Deeik concedes he continues to maintain an office in Napa, his

10  surgical volume has allegedly been reduced to zero.  Dr. Deeik summarizes the competitive

11  harm as follows (Opp. at 7 (citing Compl. at ¶¶ 86–89)):

12  　　　　The remaining surgeons are lower quality competitors who
　　　　perform more invasive surgeries.  The Queen, the area's only
13  　　　　hospital with robotic facilities, has lost more than two thirds of its
　　　　volume while its hybrid and robotic operating rooms sit empty.
14  　　　　Consumers' few remaining choices in the relevant market involve
　　　　risky, invasive procedures performed by lower quality surgeons;
15  　　　　they suffer more complications and lesser outcomes.

16  In addition to the instant antitrust action, Dr. Deeik has filed two other suits in relation

17  to the conduct discussed above.  *First*, as stated, Dr. Deeik initiated an arbitration against Dr.

18  Klingman.  The arbitrator found for Dr. Deeik, awarding him over $600,000 in damages for his

19  defamation and intentional infliction of emotional distress claims.  *Second*, Dr. Deeik filed a

20  state court action against NorthBay alleging he was wrongfully removed from his posts as

21  director of cardiac surgery (*Deeik v. NorthBay Healthcare Group Inc., et al.*, No. FCS-045917

22  (Sup. Ct. Solano Cty. 2015)).  Defendants' demurrer is currently pending in that case.  This

23  order follows full briefing.

24  **ANALYSIS**

25  **1.**     **PLAINTIFFS' ANTITRUST CLAIMS.**

26  To survive a motion to dismiss, a complaint must contain sufficient factual matter,

27  accepted as true, to state a claim for relief that is plausible on its face.  A claim is facially

28  plausible when there are sufficient factual allegations to draw a reasonable inference that the

5

United States District Court
For the Northern District of California

1    defendant is liable for the conduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   An

2    antitrust plaintiff must allege evidentiary facts that, if true, would "raise a right to relief above

3    the speculative level" and "raise a reasonable expectation that discovery will reveal evidence of

4    illegal agreement."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

5            To state a claim under Section 1 of the Sherman Act, claimants must plead not just

6    ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove:  (1) a

7    contract, combination, or conspiracy among two or more persons or distinct business entities;

8    (2) by which the persons or entities intended to harm or restrain trade or commerce among the

9    several States, or with foreign nations; (3) which actually injures competition.  *Kendall v. Visa*

10   *U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

11           Here, plaintiffs have alleged facts sufficient to state a plausible claim under Section 1.

12   The complaint has set forth who the main players in the scheme were and how they went about

13   executing it.  As detailed above, the complaint discusses the initial conspiracy between Dr.

14   Klingman and several administrators at NorthBay, the different prongs of their scheme, the time

15   line and purpose, several specific policies enacted to force Dr. Deeik out, conversations with

16   competitors, and specific emails from which one could plausibly infer an intent to cease

17   referrals to Dr. Deeik and dampen the market.  Furthermore, the complaint has plausibly alleged

18   that the intent of the scheme was to harm competition.  The complaint sets forth Dr. Nacify's

19   substandard results, the setbacks the new vascular surgery program faced, and the threat Dr.

20   Deeik posed to this program (and NorthBay's pending bond deal).  The complaint sufficiently

21   alleges that the conspirators intended to squeeze out Dr. Deeik, and the superior product he

22   offered (minimally invasive cardiac and vascular surgery), in order to prop up their inferior

23   product.  Lastly, the complaint has plausibly alleged that the scheme actually injured

24   competition.  The complaint states that the scheme has "resulted in significant anticompetitive

25   harm to the market for cardiovascular and thoracic surgery in Napa and Solano counties in

26   terms of quality of care, the range of services offered, the number of surgeons, and cost"

27   (Compl. at ¶ 86).  The complaint further states that the number of cardiac surgeries performed at

28

6

United States District Court

For the Northern District of California

1    Queen (the only hospital in the market capable of conducting minimally invasive cardiac and

2    thoracic surgery) have reduced from over 300 in 2007 to less than 80 in 2015 (Compl. at ¶ 87).

3            A closely analogous case to ours is *Oltz v. St. Peter's Community Hospital*, 861 F.2d

4    1440 (9th Cir. 1988).  There, a nurse anesthetist brought an antitrust action against a hospital

5    and four anesthesiologists alleging that they had forced him out of the market, causing

6    competitive harm.  The nurse contended that the hospital and doctors "drafted policies

7    encouraging supervision by anesthesiologists of all anesthesia administered at St. Peter's,

8    removed Mr. Oltz from the anesthesia call schedule, and declin[ed] administrative as opposed to

9    clinical supervision of Mr. Oltz' practice at St. Peter's."  *Id*. at 1443.  The hospital and doctors

10   also conspired to terminate Oltz' billing contract.  After a trial against the hospital (the four

11   doctors settled) the jury found for Oltz, specifically finding that competition among providers of

12   anesthesia services in the Helena area had been harmed.

13           Our court of appeals affirmed the jury's verdict on liability, rejecting the hospital's

14   argument that the relevant market had been broader than the market for anesthesia services in

15   Helena, and stated that "[d]efining the relevant market is a factual inquiry ordinarily reserved

16   for the jury."  *Id*. at 1446.  Our court of appeals went on to state that the evidence showed harm

17   to two market segments:  "One segment was the market in which anesthesia service providers

18   compete for staff privileges at hospitals; the other was the patient market for anesthesia

19   services" and that "a showing of injury to competition in either market suffices for the rule of

20   reason."  *Id*. at 1447.  In analyzing the jury's verdict, the decision went on to state:

21               [T]he termination of Oltz had actual detrimental effects on
             competition among anesthesia service providers in that area.  The
22           evidence amply supports that finding.  Some patients and surgeons
             who preferred the services of Oltz were hindered from obtaining
23           them.  Furthermore, the price of anesthesia services and the
             incomes of the M.D. anesthesiologists rose dramatically because of
24           the challenged restraint.  Given that the ability to raise price and to
             exclude competition are hallmarks of market power, the finding of
25           actual harm to competition suffices under Sherman Act § 1 even in
             the absence of extended market analysis.
26
     *Id*. at 1448.  Furthermore, in analyzing the intent element, the decision asserted that "[a]mple
27
     evidence supports Oltz' claim that the M.D. anesthesiologists and St. Peter's conspired to
28
     terminate his billing contract . . . Thus, the jury could justifiably have concluded that the goal

                                                    7

United States District Court

For the Northern District of California

1    was, at least partially, the elimination of Oltz as a direct competitor of the anesthesiologists.

2    Such a goal would furnish the necessary intent for a Section 1 claim." *Id*. at 1449.

3         So too here.  As in *Oltz*, Dr. Deeik alleges that a doctor and hospital administrators

4    conspired to terminate his contract and squeeze him out NorthBay.  Furthermore, Dr. Deeik

5    alleges that the conspirators defamed him, spread false rumors, and tampered with his referrals

6    in an effort to freeze him out of the broader market.  At the Rule 12 stage, these allegations are

7    sufficient to withstand defendants' motion to dismiss.

8         Defendants make several arguments in support of their motion.  Primarily, defendants

9    assert that the complaint does not plead sufficient specific facts as required by the Supreme

10   Court's decision in *Twombly* and other recent decisions from our court of appeals, such as:  *In*

11   *re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186 (9th Cir. 2015);

12   *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008); and *Name.Space, Inc. v. Internet*

13   *Corporation for Assigned Names and Numbers*, 795 F.3d 1124 (9th Cir. 2015).  Defendants

14   correctly state that "[i]t is not enough to merely include conclusory allegations that certain

15   actions were the result of a conspiracy; the plaintiff must allege facts that make the conclusion

16   plausible." *Id*. at 1129.  Defendants assert that the facts alleged are consistent with reasonable

17   business practices not meant to harm competition.

18        As stated above, however, the complaint has pled a plausible conspiracy between Dr.

19   Klingman and administrators at NorthBay.  Specifically, Dr. Deeik alleges that the conspirators

20   disparaged him to other medical providers, spread word that Dr. Deeik had moved to Santa

21   Rosa, persuaded doctors to decline to serve as Dr. Deeik's backup surgeon, lured doctors who

22   previously referred patients to Dr. Deeik, and arbitrarily enforced surgical requirements only

23   against Dr. Deeik.  Furthermore, the complaint describes specific meetings between Dr.

24   Klingman and NorthBay administrators as well as emails plausibly suggesting concerted action.

25        Defendants also assert that the allegations are not sufficiently specific as to the three

26   NorthBay entities named as defendants herein — NorthBay Healthcare Corporation, NorthBay

27   Healthcare Group, Inc., and NorthBay Medical Group, Inc.  The complaint, however, states that

28   NorthBay Healthcare Corporation is the parent entity that owns NorthBay Healthcare Group

8

United States District Court

For the Northern District of California

1   (which operates the hospital) and NorthBay Medical Group (which employs the physicians)

2   (Compl. at ¶¶ 12–14, 35, 73).  Furthermore, Dr. Deeik alleges that NorthBay administrators

3   presented themselves not as representatives of single entities but of the entire corporate family.

4   More importantly, Dr. Deeik does not allege that separate NorthBay entities conspired with

5   each other.  Rather, he alleges NorthBay conspired with Dr. Klingman.  While defendants also

6   assert that Dr. Deeik has failed to allege sufficient facts to implicate nonparty St. Helena

7   Hostpital in the conspiracy — the only allegations regarding St. Helena are that it sent Dr.

8   Dunnington to NorthBay to replace Dr. Deeik — the complaint pleads a plausible conspiracy

9   between Dr. Klingman and the named NorthBay administrators.  Accordingly, a failure to plead

10  more specifics regarding St. Helena's involvement is not fatal to the antitrust claims.

11          Next, defendants argue that the complaint has failed to sufficiently allege antitrust

12  injury, that is, a harm to competition.  Defendants assert that whatever Dr. Deeik's injuries are,

13  they are not antitrust injuries.  Instead, defendants contend, they are merely injuries to Dr.

14  Deeik himself that do not affect competition in the broader market.

15          Not so.  Dr. Deeik has alleged, as in *Oltz*, that his exclusion from the market (along with

16  Dr. Kanaan's exclusion) has led to "lesser quality services," has "caused consumers to pay

17  supracompetitive prices," and "gave consumers fewer choices" (Compl. at ¶ 103).   The

18  complaint also alleges that the conspiracy has "resulted in significant anticompetitive harm to

19  the market for cardiovascular and thoracic surgery in Napa and Solano counties in terms of

20  quality of care, the range of services offered, the number of surgeons, and cost," specifically

21  pointing out that Queen, the only facility capable of performing the full range of minimally

22  invasive cardiac and thoracic surgery, has been crippled (Compl. at ¶¶ 86–87).  In a similar

23  factual scenario, in which a physician sued a hospital for revoking his staff privileges, our court

24  of appeals stated as follows regarding alleging antitrust injury:

25              Pinhas alleges in his complaint that the conspiracy was intended to
             boycott his attempts at providing patients with lower prices as a
26           result of his ability to perform operations at a rate quicker than that
             of his competitors.  Assuming Pinhas's allegation that he provides
27           his services at a rate cheaper than that of his competitors to be true,
             the preclusion of Pinhas from practicing could conceivably injure
28           competition by allowing other similar doctors to charge higher
             prices for their services.  Or Pinhas may show that his preclusion

9

1   otherwise substantially reduced total competition in the market.
    We therefore conclude that Pinhas has adequately pleaded injury to
2   competition.

3   *Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1032 (9th Cir. 1989).  So too here.

4        Finally, defendants contend that Dr. Deeik has failed to plead a plausible geographic

5   market.  The complaint alleges the relevant geographic market is "Napa and Solano counties in

6   California, which roughly compose the area of effective competition" (Compl. at ¶ 24).

7   Defendants point out that this geographic market definition leaves out two nearby hospitals that

8   a patient could potentially go to.  To demonstrate this, defendants included the following map in

9   their motion, showing Santa Rosa Memorial Hospital and John Muir Medical Center as close

10  by, but not included in the complaint's alleged geographic market (Mot. at 16):

11

12

13



14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

1    In a post *Twombly* decision, reversing the district court's dismissal of an antitrust action

2    based on an implausible geographic market, our court of appeals stated: "An antitrust complaint

3    therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that

4    the alleged market suffers a fatal legal defect.  And since the validity of the relevant market is

5    typically a factual element rather than a legal element, alleged markets may survive scrutiny under

6    Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Newcal Industries, Inc. v.*

7    *Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).  Furthermore, subject to Rule 56,

8    "[d]efining the relevant market is a factual inquiry ordinarily reserved for the jury." *Oltz*, 861 F.2d

9    at 1446.  Although defendants' argument regarding the geographic market is plausible, it is simply

10   not ripe at the Rule 12 stage, where there is no factual record to stand on.  Here, the complaint has

11   alleged that Napa and Solano counties are the relevant market because patients are not willing to

12   travel outside of those counties to obtain the subject cardiac and thoracic surgical services.

13   Accordingly, this order finds that the geographic market has been plausibly defined.

14          **2.      PLAINTIFFS' OTHER CLAIMS.**

15          In addition to pleading antitrust claims, the complaint asserts an unfair competition claim

16   under Cal. Bus. & Prof. Code Section 17200 as well as a claim for tortious interference with

17   prospective economic advantage.  The Section 17200 claim alleging unfair competition is

18   derivative of the antitrust claims.  Accordingly, as this order finds plaintiffs have pled plausible

19   antitrust claims, the motion to dismiss the Section 17200 claim is **DENIED**.

20          Based on the allegations in the complaint, however, the tortious interference claim is time

21   barred.  The statute of limitations for claims of tortious interference with prospective economic

22   advantage is two years.  Cal. Code Civ. Proc. § 339.  Here, the complaint alleges that in "the fall of

23   2013, [Dr. Deeik] became aware of the coordination and agreements between NorthBay and its

24   coconspirators" (Compl. at ¶ 91).  Dr. Deeik filed this lawsuit, however, on December 29, 2015,

25   more than two years later.  In his opposition, Dr. Deeik asserts that he had entered into a tolling

26   agreement with defendants on December 12, 2014, which terminated on May 30, 2015,

27   sufficiently tolling the statute of limitations such that the tortious interference claim is timely.

28

United States District Court

For the Northern District of California

1   That tolling agreement, however, is nowhere to be found in the complaint.  Accordingly, the

2   motion to dismiss the tortious interference claim is **GRANTED**.

3                                          **CONCLUSION**

4          For the reasons stated above, defendants' motion to dismiss the antitrust claims and the

5   Section 17200 claim are **DENIED**.  To the extent stated herein, defendants' motion to dismiss the

6   tortious interference claim is **GRANTED**.  Plaintiffs shall have until **MAY 9, 2016 AT NOON**, to file

7   a motion, noticed on the normal 35-day track, for leave to amend the tortious interference claim.

8   A proposed amended complaint must be appended to this motion.  Plaintiffs must plead their best

9   case.  The motion should clearly explain how the amended complaint cures the deficiencies

10  identified herein, and should include as an exhibit a redlined or highlighted version identifying all

11  changes.

12         The motion hearing set for April 21 is **VACATED**.  The initial case management conference,

13  originally scheduled for April 21 at Eight A.M., is hereby moved to **APRIL 21 AT ELEVEN A.M.**

14  At the case management conference, the parties should be prepared to discuss whether the instant

15  antitrust litigation should be stayed pending the outcome of Dr. Deeik's state court action (*Deeik v.*

16  *NorthBay Healthcare Group Inc., et al.*, No. FCS-045917 (Sup. Ct. Solano Cty. 2015)).

17

18         **IT IS SO ORDERED.**

19

20  Dated:  April 19, 2016.

21                                                                 WILLIAM ALSUP
                                                                   UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28